IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>            v.<br><br>ALEXANDER S. ROWLAND | CRIMINAL ACTION<br><br>NO. 20-316-KSM-1 |

**MEMORANDUM**

**MARSTON, J.**                                                                                              **October 22, 2020**

      Presently before the Court is the government's appeal of the pre-trial release order of United States Magistrate Judge Patricia L. Dodge of the Western District of Pennsylvania in the above-captioned case. (Doc. No. 6). Following Defendant Alexander S. Rowland's detention hearing on October 19, 2020, Judge Dodge found that there were certain conditions that could assure the safety of others in the community and Defendant's appearance in court, and ordered his release. (*See* Doc. No. 5; *see generally* Oct. 19, 2020 Detention Hearing Tr.)  However, Judge Dodge agreed to grant the government's request for a 24-hour stay of her order. (*Id.*)  On October 20, 2020, the government filed its appeal (Doc. No. 6), and this Court ordered that Defendant remain detained pending its ruling on the appeal (Doc. No. 7).  Upon consideration of evidence presented before the Court at a hearing on October 21, 2020 and the arguments of counsel, the Magistrate Judge's order is revoked and the government's motion for detention shall be granted.

**I.**     **Standard of Review**

      This Court has jurisdiction to review the Magistrate Judge's decision under 18 U.S.C. § 3145(a)(1).  Pursuant to Section 3145(a)(1), this Court is required to conduct a *de novo* review of the Magistrate Judge's ruling.  *See United States v. Delker*, 757 F.2d 1390,

1394 (3d Cir. 1985); *see also United States v. Talbert*, No. 20-266, 2020 WL 6048788, at *3 (W.D. Pa. Oct. 13, 2020).  In conducting this review, the district court may rely on the transcript of the proceeding before the Magistrate Judge.  *Id.*; *see also United States v. Rodriguez*, Criminal Action No. 07-709, 2007 WL 4373042, at *2 (E.D. Pa. Dec. 13, 2007).

The Bail Reform Act, which governs the issue of pretrial detention, delineates four factors that we consider in determining whether conditions of release exist that "will reasonably assure" Defendant's appearance as required and "the safety of any other person and the community":

(1) the nature and circumstances of the offense charged;

(2) the weight of the evidence against Defendant;

(3) the history and characteristics of Defendant, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(4) the nature and seriousness of the danger to the community posed by Defendant's release.

18 U.S.C. § 3142(g); *see also United States v. Himler,* 797 F.2d 156, 161 (3d Cir. 1986). ("Judicial officers making risk of flight determinations are guided by the factors set forth in § 3142(g)."); *United States v. Miller*, No. Crim.A. 00-103-02, 2000 WL 633048, at *2 (E.D. Pa. May 5, 2000).

The government has the burden of demonstrating risk of flight justifying pre-trial detention by a preponderance of the evidence.  *See Himler,* 797 F.2d at 161.  The government must show a defendant presents a danger to the community, such that pre-trial detention is warranted, by clear and convincing evidence.  *See* 18 U.S.C. § 3142(f);

*Himler,* 797 F.2d at 161.  Although a rebuttable presumption applies to certain criminal violations, it does not apply in this case.  *See* 18 U.S.C. § 3142(e).

**II.     Findings of Fact**

The Court makes the following Findings of Fact with respect to pre-trial detention:

1. On September 22, 2020, a federal grand jury returned a sealed bill of indictment charging Defendant with seven counts of mail fraud in violation of 18 U.S.C. § 1341; 30 counts of wire fraud in violation of 18 U.S.C. § 1343; one count of bank fraud in violation of 18 U.S.C. § 1644; one count of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5; one count of adviser investment fraud in violation of 15 U.S.C. §§ 80b-6 and 80b-17; and two counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  (Doc. No. 1; *see also* Doc. No. 6 at p. 1.)

2. The indictment alleges that Defendant started Roaring Investments in July 2016 in his Gibbstown, New Jersey apartment, to invest money for other people.  Defendant, a former warehouse operator, had never worked in the securities industries before and did not hold a license that would enable him to provide financial services.  In May 2017, the Defendant moved Roaring Investments from New Jersey to a WeWork shared office in Philadelphia.  Defendant guaranteed his clients a minimum of a 25% return on funds they invested with his business, but such returns were never realized.  Rather, actual losses (i.e., the amount of investors' outstanding principal that had not been repaid) totaled $2,139,746. 51.  Intended losses (i.e., the total amount collected from investors) amounted to nearly $3 million.  (Doc. No. 1; *see also* Doc. No. 6.)

3. The indictment alleges that Defendant induced approximately 122 clients to invest in funds with Roaring Investments through a series of false representations, promises, and omissions of material fact.  These false representations and promises included, among many others, that he was a

3

licensed investment advisor and that he made millions by trading stocks, foreign currency and cryptocurrency, and that clients would earn returns of 50% or higher, with a guaranteed minimum of a 25% return. The omissions of material fact included, among others, that Defendant commingled client funds with his own personal funds, used client funds for his personal use, and relied upon the recruitment of new clients to repay prior investors (known as a "Ponzi scheme"). (Doc. No. 1; *see also* Doc. No. 6.) At bottom, the indictment alleges that Defendant only actually invested a mere five percent of the client funds that he received, and of this small amount that was invested, he lost a fifth of it due to his investment decisions.[1] Defendant used the remaining 95% of the client funds in a number of unauthorized ways, including (a) taking large cash withdrawals; (b) paying his own personal bills; (c) buying luxury vehicles; (d) paying for vacations and jewelry; (e) paying for gym memberships; (f) paying the operating expenses of Roaring Investments, including employee salaries; and (g) making payments to earlier clients who had invested with Roaring Investments. (Doc. No. 1.)

4. The Federal Bureau of Investigations ("FBI") began an investigation into Defendant for various types of fraud in late December 2018. (Oct. 19, 2020 Detention Hearing Tr. at 5:6–11.) During the course of this two-year investigation, the FBI and an Assistant United States Attorney had contact with Defendant and his attorneys at various times. (*See, e.g.*, Oct. 21, 2020 Hearing Tr. at 14:11–16:8.) In or around July 2020, Defendant was aware that the government intended to present an indictment before a federal grand jury in the near future. (*See, e.g.*, *id.* at 15:14–21 (the government indicating that Defendant had been told that the indictment would be returned in the coming months, as soon as grand jury time could be secured in light of COVID-19); *id.* at

---

[1] Specifically, Defendant invested only approximately $518,563 of the $2,954,880 in client funds he received. Of the $518,563 that he invested, his investment decisions caused a net loss of $104,589.

20:1–4 (Defendant's attorney indicating that Defendant called her in August 2020 to ask if she had heard anything from the government regarding the indictment).)  At that time, the address the FBI had for Defendant was in South Jersey, and to the FBI's knowledge, Defendant had been a lifelong New Jersey resident.[2]  (Oct. 19, 2020 Detention Hearing Tr. at 7:5–17.)

5.  Following the return of the indictment on September 22, 2020, special agents with the FBI attempted to locate Defendant at his residence in New Jersey.  (*Id.* at 7:5–20.)  At that time, the FBI learned from Defendant's landlord that Defendant no longer resided at that location and had not provided a forwarding address.  (*Id.* at 5:23–6:11.)  In addition, the landlord advised that Defendant's phone number, which the landlord had previously used to contact Defendant, was no longer in service.  (*Id.* at 6:2–11.)

6.  Upon further investigation, the FBI learned that Defendant had quit his job in the Philadelphia area where he had been earning approximately $80,000 per year (*id.* at 9:3–20)[3], changed his cellphone number (*id.* at 9:25–10:2), created a new email address with the Switzerland-based provider protonmail.com (Oct. 21, 2020 Hearing Tr. at 17:1–18)[4], and moved to the Pittsburgh area (Oct. 19, 2020 Detention Hearing Tr. at 10:4–12).  In addition, the FBI learned that Defendant and his wife entered into a lease agreement for an apartment using Defendant's wife's maiden name.  (*See, e.g.*, Sept. 1, 2020 Residential Lease Package.)[5]

---

[2] As part of this investigation, in April 2019, the FBI executed a search warrant at Defendant's home office in New Jersey, in which it found over twenty firearms.  (Oct. 19, 2020 Detention Hearing Tr. at 10:22–11:4.)

[3] Defendant now works three separate jobs, earning approximately $4,000 to $5,000 per month pre-tax. (Oct. 20, 2020 Detention Hearing Tr. at 7:23–8:5.)

[4] Proton Mail is a Switzerland-based free, private email service that refuses to provide any IP address records or subscriber records.  (*Id.*)  As such, to the extent the government would have tried to subpoena Proton Mail, the government would not have been able to determine anything about Defendant.  (*Id.*)

[5] Even though Defendant's wife signed the lease using her married last name (Rowland) and Defendant and his wife initialed the lease as KR and AR (for Rowland), the lease references the tenants as Defendant and his wife using Defendant's wife's maiden name.  (*Compare* Sept. 1, 2020 Residential Lease Package

7. Defendant was arrested in the Western District of Pennsylvania on October 14, 2020.

8. Defendant offers evidence that he relocated his family to the Pittsburgh area to be closer to his wife's family, who live in Wellsboro, Pennsylvania. (Oct. 21, 2020 Hearing Tr. at 21:6–13.) Wellsboro is approximately a 205-mile drive from Murrysville, Pennsylvania, where Defendant now resides. (*Id.* at 25:3–11; *see also* Google Maps, last searched Oct. 21, 2020 (showing that the distance between Defendant's Murrayville address and Wellsboro is about 207 miles).) Accordingly, Defendant is approximately a 3 hour and 38 minute drive away from his wife's parents. (Oct. 21, 2020 Hearing Tr. at 25:4–11; *see also* Google Maps, last searched Oct. 21, 2020 (showing that driving from Murrysville to Wellsboro would take approximately 3 hours and 40 minutes).) While Defendant and his family lived in New Jersey, their residence was a seven hour drive from his wife's parents. (Oct. 21, 2020 Hearing Tr. at 25:12–14.)

9. Defendant also proffered that he moved away from New Jersey and changed his cell phone number because of threats he received from the victims of the offense. (*Id.* at 20:20–21:5.) Defendant relied in part on the FBI agent's testimony, in which the agent testified that in or around April 2019, an investor showed up at Defendant's house, there was a verbal exchange, and the police were called. (*Id.*; Oct. 19, 2020 Detention Hearing Tr. at 13:5–13.)

10. As to his prior record, in 2009, Defendant pled guilty to theft by unlawful taking, and in 2010, Defendant was arrested and charged with uttering a forged document (bad checks), but the charges were then dismissed. Both offenses occurred in New Jersey. (Pre-Trial Services Report ("PTSR") at p. 4.)

11. Defendant has no reported history of substance abuse issues or treatment. (PTSR at p. 4.) However, Defendant admits he has suffered from depression in the past. (*Id.* at p. 3.)

---

at p. 1 *with id.* at pp. 3–9.)

**III.    Discussion**

First, we are not persuaded by the government's argument that Defendant's possession of numerous firearms makes him a danger to the community by clear and convincing evidence. However, we do conclude that the government has proven by a preponderance of evidence that Defendant presents a serious risk of flight.  As discussed above, the evidence indicates that in or around July 2020, Defendant was aware that the government intended to present an indictment before a federal grand jury in the near future.  Nonetheless, in or around August 2020, Defendant quit his job in the Philadelphia area, changed his cellphone number, and moved from South Jersey to the Pittsburgh area.  The facts that Defendant created a new email address through a service by which his IP address and subscriber records could not be tracked, and that he and his wife entered into a lease agreement for their Murrysville apartment using Defendant's wife's maiden name, are particularly significant.  Defendant does not address the fact that he and his wife entered into a lease agreement using Defendant's wife's maiden name.  Although Defendant offers evidence that he relocated his family to the Pittsburgh area to be closer to his wife's family in Wellsboro, Pennsylvania, his family is now only half the distance closer to his in-laws than they were before when they lived in their New Jersey residence (i.e., approximately a three and half hour drive away versus a seven hour drive away).  The recent relocation to the Pittsburgh area combined with the fact Defendant's Murrysville address is still a significant distance from Defendant's in-laws lead us to conclude that Defendant does not appear to have significant familial or community ties to this location where he admits he has resided for only approximately one month.

The Court also notes that Defendant's criminal history is limited to a retail theft conviction for which he was fined and an arrest for bad checks which was then dismissed.

Despite Defendant's limited criminal history, if convicted of the charges in the indictment, Defendant faces a significant term of imprisonment. The Court recognizes the United States Sentencing Guidelines are only advisory. We note, however, that the government asserts that the advisory guideline sentence for Defendant, if convicted at trial, is 168 to 210 months' imprisonment. Further, the evidence against the Defendant, as outlined at length in the indictment, is strong. The weight of the evidence against Defendant combined with this potential severe penalty he faces if convicted creates a serious risk that Defendant will flee to avoid such penalties; and even bond and electronic monitoring are not enough to ensure his obligation to appear before the Court.

For these reasons, the Court determines that no condition or combination of conditions will reasonably assure the appearance of Defendant as required.

**IV.    Conclusion**

For the foregoing reasons, we grant the government's motion.

An appropriate order follows.